**CONSUMER LITIGATION LAW CENTER, APC**
September J. Katje, Esq. (SBN 227896)
100 N. Barranca, Suite 700
West Covina, CA 91791
Telephone: (800) 787-5616
Fax: (888) 909-7947
sk@consumerlitigationlawcenter.com

Attorney for Plaintiff,
ANDREA CHANCELLOR

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA (OAKLAND)

| | |
|---|---|
| ANDREA CHANCELLOR, an individual,<br><br>    Plaintiff,<br><br>  v.<br><br>ONEWEST BANK, a Federal Savings Bank, formerly known as INDYMAC FEDERAL BANK SAVINGS BANK and INDYMAC MORTGAGE SERVICES; CAL-WESTERN RECONVEYANCE CORPORATION, a California Corporation; and all persons or entities unknown claiming any legal or equitable right, title, estate, lien or interest in the property described in this complaint adverse to Plaintiff's title thereto, and DOES 1 through 25, inclusive,<br><br>    Defendants. | Case No.: 3:12-cv-01068-LB<br><br>**VERIFIED THIRD AMENDED COMPLAINT FOR:**<br><br>1. **SET ASIDE PENDING TRUSTEE SALE BASED UPON WRONGFUL FORECLOSURE IN VIOLATON OF CIVIL CODE §2923.5**<br>2. **BREACH OF CONTRACT (ORAL)**<br>3. **BREACH OF CONTRACT (WRITTEN)**<br>4. **VIOLATION OF RESPA**<br>5. **VIOLATION OF B&P §17200**<br>6. **NEGLIGENCE**<br><br>**UNLIMITED JURISDICTION** |

   COMES NOW the Plaintiff, ANDREA CHANCELLOR, a widower and single woman ("Plaintiff"), complaining of the Defendants, and each of them, the following:

1

# I.

## INTRODUCTION

1.      This is an action for, violations of California Civil Code §§ 2923.5, Breach of Contract, Bus. & Prof. code §§ 17200, *et seq.,* and other Federal and California statutory and common law.  Plaintiff brings this action against ONEWEST BANK, a Federal Savings Bank, formerly known as INDYMAC FEDERAL SAVINGS BANK and INDYMAC MORTGAGE SERVICES; PLAZA HOME MORTGAGE, INC., a California Corporation; CAL-WESTERN RECONVEYANCE CORPORATION, a California Corporation, and DOES 1 through 25, based upon Defendants' non disclosure and fraudulent concealment of material information relating to Defendants' Adjustable Rate Mortgage ("ARM") loan documents, and Defendants' failure to properly handle the attempted foreclosure of Plaintiff's Subject Property and process Plaintiff's numerous loan modification applications and the promises made to Plaintiff by Defendants therewith.

# II.

## THE PARTIES

2.      Plaintiff ANDREA CHANCELLOR  ("Plaintiff"), a senior citizen and a widow, is, and at all times herein mentioned was, a resident of the State of California, County of Alameda.

3.      Plaintiff is informed and believes, and thereon alleges, that Defendant ONE WEST BANK (hereinafter referred to as "ONEWEST") is a corporate entity organized under the laws of an unknown State, purporting to have its headquarters at 888 East Walnut Street, Pasadena, California 91101. This entity purchased or otherwise acquired INDYMAC FEDERAL BANK, F.S.B. and INDYMAC MORTGAGE SERVICES.  While the specific acts and omissions referenced herein were and/or may have been committed by INDYMAC MORTGAGE BANK, F.S.B. and INDYMAC MORTGAGE SERVICES, liability therefore, is imputed upon ONE WEST as their successor in interest and due to the fact that certain defenses are not available to a "holder in due course" which are the subject of this action.

**THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT**

4.      Plaintifff is informed and believes, and thereon alleges, that Defendant ONEWEST is, and at all relevant times was a California Corporation, qualified to do business in California, doing business in this judicial district.  At all times hereto Defendantwas engaged in the business of originating and selling the Option ARM loans that are the subject of this Complaint.  ONEWEST is the loan servicer of the obligation secured by the Deed of Trust.

5.      Plaintiff is informed and believes and thereon alleges that Defendant, CAL-WESTERN RECONVEYANCE CORPORATION ("hereinafter referred to as "CAL-WESTERN"), is, and at all times herein mentioned was, a California corporation, qualified to do business in the State of California, and doing business in the above-referenced judicial district.

a.      Plaintiff is informed and believes and thereon alleges that at no time has defendant CAL-WESTERN been, in fact or as a matter of law, the Trustee of the subject Deed of Trust.

b.      Plaintiff is informed and believes and thereon alleges that CAL-WESTERN's filing of a Notice of Default was in violation of California law since, per the express terms of the subject Deed of Trust, only the Lender, and no other party, has the ability or right to substitute CAL-WESTERN as Trustee of the Deed of Trust.  Plaintiff is informed and believes and thereon alleges that no party with the right to substitute the Trustee of the Deed of Trust in fact did so as to CAL-WESTERN.

c.      Plaintiff alleges that the Notice of Default recorded by CAL-WESTERN, which purports to identify CAL-WESTERN as agent for the "Beneficiary" of the putative Deed of Trust, includes intentionally fraudulent and misleading information as it expressly states CAL-WESTERN is acting on behalf of such Beneficiary,  despite the fact that only the Lender,  as that term is defined in the Deed of Trust, and not the Beneficiary, may initiate a non-judicial foreclosure as set forth in section 22 of the Deed of Trust.

6.      Plaintiff is informed, believes, and thereon alleges, that each of the Defendants are responsible in some manner, either by act or omission, strict liability, fraud, deceit, fraudulent concealment, negligence, respondeat superior, joint venture principles, breach of

THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT

contract or otherwise for the occurrences herein alleged, and that Plaintiff's injuries, as herein alleged were proximately caused by the conduct of Defendants.

7. Plaintiff is informed, believes, and thereon alleges, that at all times herein mentioned, each defendant was acting in concert or participation with each other, or was a joint participant and collaborator with the others in the acts complained of, and/or was the agent or employee of the others in doing the acts complained of herein, each and all of them acting within the course and scope of said agency and/or employment by the others, each and all of them acting in concert one with the other and all together. Each defendant was the co-conspirator, agent, servant, employee, assignee and/or joint venturer of each of the other defendants and was acting within the course and scope of said conspiracy, agency, employment, assignment and/or joint venture and with the permission and consent of each of the other defendants.

8. Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES 1 through 25 inclusive, and therefore sues these defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and based thereon alleges each of the fictitiously named defendants are responsible in some manner for the injuries to Plaintiff alleged herein and that such injuries as herein alleged were proximately caused by such defendants.

9. Plaintiff is informed and believes and thereon alleges that at all times herein mentioned each of the defendants was the agent and employee of the remaining defendants, and in doing the things hereinafter alleged, was acting within the course and scope of such agency and employment.

10. Plaintiff is not required to provide tender in this matter as this action attacks the validity of the underlying debt. Alleging tender would constitute an affirmation of the debt and thus would be inequitable to require one.

/ / /

/ / /

/ / /

THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT

### III.

### <u>JURISDICTION AND VENUE</u>

11.     This Court has jurisdiction over this matter pursuant to the California Constitution, Article XI, Section 10 and California Code of Civil Procedure ("CCP") §410.10 because Defendants transacted business and committed the acts complained of herein in California.

12.     The above-captioned court is the court with proper venue for this case as the Defendants entered into the underlying contract with the Plaintiff in the above-referenced jurisdiction, and the payment obligations are to be performed in the above-referenced jurisdiction.

### IV.

### <u>FACTS COMMON TO ALL CAUSES OF ACTION</u>

13.     Plaintiff, a senior citizen and and widow, at all times relevant to this Complaint, was the owner of her primary residence commonly known as **930 Blossom Way Unit 5, Hayward, CA 94541.** This property was purchased by Plaintiff on or about December 29, 1993 and will hereinafter be referred to as "Subject Property" as is legally described as the short description consisting of:

**A Condominium Comprised of:**

**Parcel One: An undivided 1/8th Interest in and to lot 1, Tract 6137, Filed July 2, 1991, Map Book 197, Pages 24 through 26, inclusive, Alameda County Records.**

**Parcel Two:Unit 5, as shown on the Condominimum Plan above referred to.**

**A.P.N.: 414-0076-112**

14.     On or abut February 26, 2007 Plaintiff obtained an Adjustable Rate Mortgage (ARM) from INDYMAC BANK, secured by a first deed of trust in the amount of $400,000.00

**THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT**

(and a second deed of trust in the amount of $50,0000) for her primary residence located at **930 Blossom Way, Unit 5, Hayward, CA 94541.** Said Deed of Trust was recorded on February 26, 2007 in ALAMEDACounty, as instrument no. 2007 083810. A true and correct copy of the Deed of Trust and FixedAdjustable Rate Rider (collectively the "Loan Documents') pertinent to this action are attached hereto as Exhibit "A".

15. The following events led up to Plaintiff obtaining this loan: On or about December 27, 2006, Plaintiff obtained a loan from Plaza Home Mortgage Inc. in the sum $427,000.00. The monthly payment was $1,823.65/mo. beginning February 1, 2007 consisting of a 5 year Adjustable Rate Mortgage, adjusting every 6 months on a LIBOR index with negative amoritization of interest accruing to the base principal loan for any payments made below the fully indexed rate of 8.125%.

16. Plaintiff was placed in such a loan despite the fact Plaintiff had sought out a 30-year fixed rate mortgage and was led to believe the Loan she was entering into was a 30-year fixed rate loan at 5.125% (actually the minimum option payment rate). In addition the Plaintiff was locked into a three (3) year prepayment penalty of 20% of the loan balance for any refinancing occurring within the first three years of the loan. In or around mid January 2007, as a result of Plaintiff being pressured into signing the Loan Agreement, Plaintiff first discovered that she had been misled by the loan type. Plaintiff was distraught and disgusted by the lack of assistance after being misled.

17. In or around early February 2007, Plaintiff received a personal referral of a local Mortage Broker, Tim Sedati, of First Priority Financial. At the initial meeting with Mr. Sedati, Plaintiff explained her entire experience and necessity to remove herself from the Plaza Mortgage loan and secure a fixed rate mortage. Mr. Sedati did not ask her any questions about her income. Plaintiff was only asked where she was employed. She told Agent that she was in a Training Assistance Program for the last 2 years, and her income was about $1,600.00/mo at that time. During the loan process, Plaintiff never filled out or signed a loan application. Plainitff

**THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT**

does recall that she provided documentation of her income tax returns and documentation on expenses to Mr. Sedati.

18.     Plaintiff never saw nor reviewed the Uniform Residential Loan Application (Application), nor was she ever informed of the contents therein.  Agent Sedati advised Plaintiff that in order to remove her from the Plaza Mortgage loan, that two loan transactions would have to be processed separating the existing loan into two separate mortgages.

19.     In or around mid February 2007, Mr. Sedati submitted a proposal to Plaintiff stating, Plaintiff would probably be eligible for two loans through lender INDYMAC, the first in the sum of a $400,00.00 with an annual percentage rate of 6.125%.  Plaintiff was told that the proposed monthly payment would be $2,041.00, and with taxes and insurance added, the payment would increase to $2,281.97/mo.  The second loan would be for the sum of $50,000.00. The combined total of the two loans with INDYMAC would be $450,000.00.  In addition, due to the PLAZA MORTGAGE prepayment penalty, Plaintiff was required to pay a penalty fee in the amount of $13,877.00.

20.     On or about February 26, 2007, a mobile notary came to the residence of Plaintiff for the purpose of closing the loan transaction.  Plaintiff recalls that she spent only about forty (40) minutes with the notary.  Plaintiff felt that she was pressured into "closing" the loan, since she had no time to read or understand the documents whatsoever.  Relying on Mr. Sedati's previous representations, Plaintiff signed the Loan Agreements without knowing what she was signing.

21.     At the time of the loan closing, it was not disclosed to Plaintiff that the monthly payment on the first deed of trust of $2,041.00 would dramatically increase every twelve months after the first five years because of the Adjustable Rate (negative amortization) component of the loan. In fact, the mortgage loan was not a fixed rate, as Plaintiff again demanded, but an adjustable rate mortage loan with a fixed period feature only for the first five years.  Further, it was not disclosed to her that the principal balance of the loan, which initially began at

**THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT**

$400,000.00, would increase dramatically due to the ten (10) year interest only component of the loan.

22.     Plaintiff is informed and believes and thereon alleges that Mr. Sedati's sole motive for pushing her to refinance her loan (who was employed by First Priorty Financial), was that he wanted to obtain as large a commission as possible, and to close as many IndyMac subprime loans to borrowers, such as Plaintiff, who had no idea how toxic these loans were. Plaintiff is further informed and believes that Mr. Sedati would accomplish this goal by persuading Plaintiff to refinance the existing loans she had, thereby increasing her loan balance by fees accrued by each loan transaction conducted within the three month period, and each and every time returning Plaintiff to the substantially similar Adjustable Rate Loan she was trying to extricate herself from. As a result of Plaintiff entering into these loans, her total principal balance increased over $25,000.00; most of which represented commission fees and penalties, with no funds going to the Plaintiff.

23.     On or about April 1, 2009, because of the undisclosed Material Ommissions resulting in increased payments to Plaintiff, Plaintiff had financial difficulty keeping her loan current. Plaintiff's financial difficulty escalated to the point that she requested to be considered for a Special Forbearance Agreement or a loan modification from ONEWEST.

24.     Since she was having difficulty communicating with ONEWEST regarding a modification, Plaintiff sought assistance from National Wholesale Financial ("NWF") in or about June 2009. NWF assisted Plaintiff in gathering and submitting documentation necessary to have ONEWEST review her for a modicifcation under the Making Home Affordable Program (HAMP).

25.     In or around October 2009, as a result of the efforts of NWF, ONEWEST offered Plaintiff a trial loan modification (Agreement) through HAMP. Plaintiff signed the Agreement on October 9, 2009. Pursuant to the terms of the agreement, Plaintiff was to pay three monthly payments of $1,159.15 for the months of November 1, 2009 through January 1, 2010. A partial copy of the HAMP Agreement is attached hereto as Exhibit "B".

**THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT**

26.     Then, without any warning to Plaintiff, on November 4, 2009, ONEWEST, through its alleged trustee, CAL-WESTERN, recorded a Notice of Default on the subject property.   The Notice of Default stated that as of November 3, 2009, Plaintiffs's loan was in Default in the amount of $15,296.00.

27.     The act of recording the Notice of Default was in violation of the terms of the Agremement set forth in section 2B therein.   In addition, Plaintiff asserts that she was told by representatives of ONEWEST that Defendants would not initiate any foreclosure proceeding unless Plaintiff defaulted under the terms of the Agreement.   Plaintiff asserts that she not only made the three (3) trial payments pursuant to the terms of the Agreement but continued to make an additional seven (7) payments through September 15, 2010.   All payments were accepted by ONEWEST and applied to the balance of her loan.   In total, Plaintiff made ten consecutive payments without being approved by ONEWEST for a permanent loan modificiation.   A copy of the Customer Account Activity Statement is attached hereto as Exhibit "C".

28.     On or about January 28, 2010, in fear that ONEWEST would proceed with  a foreclosure sale, Plaintiff filed a Chapter 13 Bankruptcy Petition in the Northern District of California Case No. 2:10-bk-40096.   Plaintiff asserts that the purpose of the Chapter 13 Bankruptcy filing was to present a feasible Chapter 13 Plan to pay back the arrearages owing on the loan because ONEWEST refused to offer her a permanent loan modification, even though she continued to make trial modification payments beyond the terms of the loan modification agreement.   A copy of the docket of the Chapter 13 case is attached hereto as Exhibit "D".

29.     Notwithstanding that ONEWEST continued to accept Plaintiff's trial loan modification payments, ONEWEST, through its alleged trustee, CAL-WESTERN, proceeded to record a Notice of Trustee's Sale on February 5, 2010.   The sale date was set for February 25, 2010.   However, since the recordation of the Notice of Sale was in violation of the automatic stay pursuant to section 262 of the Bankrutpcy Code, ONEWEST rescinded the Notice of Sale.

30.     On March 17, 2010, Plaintiff's bankruptcy case was dismissed upon motion of the Chapter 13 trustee, for failure to meet the requirements to confirm a Chapter 13 Plan.

**THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT**

31.     On March 25, 2010,  Plaintiff filed a second Chatpter 13 case.  Plaintiff's case was converted to a Chapter 7 case on April 2, 2010.  ONEWEST obtained relief from the automatic stay on September 29, 2010, which allowed ONEWEST to continue to proceed with and consummate its foreclosure proceedings.  A copy of the Order granting relief from stay is attached hereto as Exhibit "E".

32.     In or around the time ONEWEST obtained relief from stay, Plaintiff was orally informed that she did not qualify for a permanent loan modification.  She was told by ONEWEST  that she could no longer continue making the  monthly payments she had made in good faith for the last ten (10) months.   Plaintiff asserts that  ONEWEST did not give a reason for the denial.  A representative from ONEWEST merely stated that they recommended that she "save her money."

33.     Although Plaintiff was ready and willing to make additional payments, she stopped making payments as instructed.

34.     Notwithstanding this denial, Plaintiff  was determined to prove to ONEWEST that it would be in their best interests to approve her for a permanent modification.

35.     Beginning November 10, 2011, ONEWEST, through its alleged trustee, CAL-WESTERN, recorded a Notice of Trustee's Sale on the subject property.  Plaintiff is informed and believes and thereon alleges that two additional Notice of Trustee's Sales were recorded, the latest one on July 21, 2011.   However, because of her repeated request to workout a loan modification alternative, ONEWEST has postponed the sale date.  Plaintiff is further informed and believes and thereon alleges that her latest modification proposal is in the underwriting department of ONEWEST.

36.     Plaintiff has been residing in her home for nearly twenty (20) years, and wishes to continue to do so.

37.     Plaintiff is asking the Court to stay all foreclosure proceedings pending the outcome of this matter.   Plaintiff is willing to make good faith adequate protection payments to ONEWEST while  the restraining order is in effect.

**THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT**

## CALIFORNIA CIVIL CODE SECTION 2923.5

38.    In July 8, 2008, former Governor Schwarzenegger signed into law Senate Bill 1137.  This Act was subsequently codified as Civil Code §§2923.5 and 2923.6.  It governs any residential mortgage executed between January 1, 2003 and December 31, 2007.

39.    Among the protections which the statutes contain for borrowers in foreclosure is a mandatory notification, meeting, and consultation process that must be made available to the borrower by the foreclosing lender, mortgagee, trustee, beneficiary, or authorized agent, prior to filing a notice of default under Civil Code §2924.  The statute states that it is "modifying the foreclosure process to require mortgagees, beneficiaries, or authorized agents to contact borrowers and explore options that could *avoid* foreclosure."

40.    Civil Code §2923.5 also contains additional requirements that lenders, mortgagees, trustees, beneficiaries, or authorized agents must comply with prior to filing a Notice of Default pursuant to California Civil Code §2924.  This section requires the lender to contact the borrower in person or by telephone in order to assess the borrower's financial situation and explore options for the borrower to *avoid* foreclosure.  During the initial contact, the lender shall advise the borrower that he or she has the right to request a subsequent meeting and, if requested, the mortgagee, beneficiary, or authorized agent shall schedule the meeting to occur within 14 days. The assessment of the borrower's financial situation and discussion of options may occur during the first contact, or at the subsequent meeting scheduled for that purpose. In either case, the borrower shall be  provided  the toll-free telephone  number madeavailable by the United States Department of Housing and Urban Development (HUD) to find a HUD-certified housing counseling agency.

41.    Civil Code §2923.5 further requires that the lender may not file a Notice of Default until 30 days after this contact and good faith discussion takes place.

42.    Civil Code §2923.5 mandates that the Lender make a good faith effort to evaluate the borrower's financial situation and explore the borrowers' options to stay in their home.

/ / /

**THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT**

43.    In addition, Civil Code §2923.5(c) provides that if a mortgagee, trustee, beneficiary, or authorized agent has filed a notice of default prior to the enactment of §2923.5, then the mortgagee, trustee, beneficiary, or authorized agent, must, in the notice of sale, include a declaration that states (1) the borrower was contacted to assess the borrower's financial situation and to explore options for the borrower to avoid foreclosure, or (2) list the efforts made, if any to contact the borrower in the event the contact was made; and this declaration must comply with California Code of Civil Procedure §2015.

44.    Based on the intent of Senate Bill 1137, Plaintiff contends Civil Code §2923.5 requires a discussion concerning the possibility of avoiding foreclosure or modifying the current mortgage so, in these times, the borrower could actually explore the possibilities of avoiding foreclosure and not receive merely a cursory phone call assessing the borrower's financial situation.

## FIRST CAUSE OF ACTION

### TO SET ASIDE TRUSTEE SALE DATE BASED ON WRONGFUL FORECLOSURE IN VIOLATION OF SECTION 2923.5
(Against Defendant ONEWEST and DOES 1 – 25)

45.    Plaintiff hereby realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

46.    On or about November 4, 2009, Defendants initiated a non-judicial foreclosure proceeding on Plaintiff's residence by causing to record a Notice of Default and Election to Sale under Deed of Trust.

47.    Defendants authorized and/or initiated this foreclosure proceeding without first contacting Plaintiff, as was its duty pursuant to Civil Code §2923.5.

48.    Pursuant to California Civil Code §2924(b), Defendants, and each of them, had an obligation to send Plaintiff by certified mail a copy of the duly recorded Notice of Default. However, California Civil Code §2923.5 required that the Notice of Default have an attached Declaration that complied with the requirements of California Code of Civil Procedure §2015.5,

in addition to the requirements described above in this Complaint. California Civil Code §2923.5(c) provides that if the Notice of Default was filed before September 6, 2008, the Notice of Trustee's Sale can include the declaration of compliance with California Civil Code §2923.5.

49.     California Civil Code §2923.5(b) and (g)(1)(2)(A)(B)(C)(3)(4)(5) require a lender to conduct "due diligence" in attempting to contact the borrower by: attempting to contact the borrower first by a first class letter that includes a toll-free number for HUD to find a HUD-certified housing counseling agency; after the letter has been sent to contact the borrower by telephone at least three times, at three hours and on different days; attempting to contact the borrower with an automated system that connects borrowers to a live representative; send a certified letter to the borrower with return receipt requested if borrower does not respond within two weeks; provide a means for the borrower to contact the Lender in a timely manner; and posts a prominent link on the homepage of the Internet Web site.

50.     Plaintiff asserts that she had to make initial contact with Defendants in order to be considered for loan modification programs prior to the filing of the Notice of Default.

51.     Plaintiff is informed and believes Defendant did not send Plaintiff a first class letter that included a toll-free number for HUD to allow the borrower to find a HUD-certified housing counseling agency.

52.     Defendant did not attempt to contact Plaintiff by telephone at least three times, at three hours, and on different days prior to filing a Notice of Default on the Subject Property.

53.     Defendant did not send a certified letter to Plaintiff with return receipt requested prior to recording a Notice of Default on the Subject Property as required by *Civil Code* §2923.5.

54.     Thus, the filing of the Notice of Default should never have been recorded, and the act of recording was in violation of the applicable code sections set forth above.

55.     Any contact made between Plaintiff and Defendant with regards to a request for a loan modification was initiated by Plaintiff, and does not meet the Defendant's requirements to conduct "due diligence" in attempting to contact the borrower.

/ / /

13

**THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT**

56.     Thus, the filing of the Notice of Default should never have been recorded, and the act of recording was in violation of the applicable code sections set forth above.  No Default should have been recorded until Defendant contacted Plaintiff with due diligence and modification alternatives had been explored.

57.     As a result of the above acts or omissions, Defendant has violated Civil Code §2923.5 prior to their filing of the Notice of Default pursuant to Civil Code §2924. This violation makes the foreclosure and sale of Plaintiff's residence wrongful, improper, and illegal under California law.

58.     Defendant's actions were against public policy because the legislature enacted this provision to slow the process of foreclosures in order for foreclosures to be avoided.

59.     Defendant's failure to comply with Civil Code §2923.5 greatly prejudiced Plaintiff's rights of un-encumbering her property or refinancing her property in that Plaintiff was not properly noticed of the foreclosure pending on their property.

60.     As a result of these wrongful acts and omissions, Plaintiff was not properly notified of the pending foreclosure process that was instituted in violation of Civil Code §§2924(b) and 2923.5.

61.     As a result of these wrongful acts and omissions, Plaintiff has been precluded from properly curing any default in her mortgage and also from all the rights and benefits that go along with a person's ability to own and reside in a home.

62.     As a result of these wrongful acts and omissions, Plaintiff has been precluded from benefiting from the rights granted by Civil Code §§2924(b) and 2923.5, in being contacted by her lender with due diligence in an attempt to modify her current loan to a principal amount and an interest rate which she could not only afford, but would allow her to stay in her home.

63.     Notwithstanding the notice to Defendant of its violations as set forth in the Qualified Written Request (QWR) mailed to Defendant on October 18, 2011, Defendant intends

**THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT**

to pursue the foreclosure sale of Plaintiff's property.  Attached is a copy of the QWR as Exhibit "F".

64.     Plaintiff is entitled to injunctive relief prohibiting Defendant from exercising the power of sale in violation of Civil Code §2923.5, requiring Defendant to comply with the requirements of Civil Code §2923.5, and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## SECOND CAUSE OF ACTION

## BREACH OF CONTRACT (ORAL)
### (Against All Defendants)

65.     Plaintiff hereby realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

66.     ONEWEST through its agents and representatives reiterated and assured Plaintiff that they would not proceed with a foreclosure of Plaintiff's property while they were reviewing any proposed loan modification agreement of the first trust deed issued pursuant to HAMP or any other workout option.  Plaintiff was still waiting for the results of this review when Defendant ONEWEST instructed CAL-WESTERN to proceed with the foreclosure sale.

67.     Accordingly, Defendants, and each of them, breached an oral agreement they entered into with Plaintiff to not foreclose while they were reviewing the loan modification agreement.

68.     In consideration of ONEWEST's promise not to pursue a foreclosure during the loan modification process, Plaintiff agreed to, and followed through with, providing timely and thorough responses to all of ONEWEST's requests for information.  Moreover, Plaintiff continued to maintain and steward the Subject Property.

69.     As a proximate result of Defendants' breaches, Plaintiff faces the permanent loss and eviction from her home, and thereby has suffered, and will continue to suffer, general and special damages in an amount according to proof at trial in excess of $60,000.00, and such

/ / /

**THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT**

further relief as is set forth below in the section captioned Prayer for Relief, which is by this reference incorporated herein.

## THIRD CAUSE OF ACTION

### BREACH OF CONTRACT (WRITTEN/HAMP)
### (Against All Defendants)

70.     Plaintiff hereby realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

71.     In or around October 2009,  ONEWEST offered Plaintiff a Trial Period Plan Agreement (hereinafter "Agreement") loan modification through HAMP.

72.     Plaintiff signed the Agreement on October 9, 2009 and returned the signed Agreement to ONEWEST, see Exhibit "B".

73.     Pursuant to the terms of the Agreement, Plaintiff was to pay three monthly payments  of $1,159.15 for the months of November 1, 2009 through January 1, 2010 and ONEWEST agreed to forebear all foreclosure activities on the Plaintiff's Subject Property during the terms of the Agreement.  The applicable portion of the Agreement 2B reads in part, "[T]he Lender will suspend any scheduled foreclosure sale, provided I continue to meet the obligations under the Plan…" Plaintiff made her first payment to ONEWEST as required pursuant to the Agreement on or before November 1, 2009.

74.     Then, without any warning to Plaintiff, on November 4, 2009, just days after Plaintiff performed and made her first payment under the Agreement, ONEWEST, through its alleged trustee, CAL-WESTERN, recorded a Notice of Default on the Subject Property.

75.     The act of recording the Notice of Default was in violation of the terms of the Agreement set forth in section 2B therein.   In addition, Plaintiff asserts that she was told by representatives of ONEWEST that Defendants would not initiate any foreclosure proceeding unless Plaintiff defaulted under the terms of the Agreement.  Plaintiff asserts that she not only made the three (3) trial payments pursuant to the terms of the  Agreement but continued to make

/ / /

**THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT**

an additional seven (7) payments through September 15, 2010. All payments were accepted by ONEWEST and applied to the balance of her loan.

76.     In total, Plaintiff made ten consecutive payments to ONEWEST while they continued the foreclosure process in violation of the Agreement and without being approved by ONEWEST for a permanent loan modificiation. A copy of the Customer Account Activity Statement is attached hereto as Exhibit "C".

77.     As a proximate result of Defendants' breaches, Plaintiff faces the permanent loss and eviction from her home, and thereby has suffered, and will continue to suffer, general and special damages in an amount according to proof at trial in excess of $60,000.00, and such further relief as is set forth below in the section captioned Prayer for Relief, which is by this reference incorporated herein.

## FOURTH CAUSE OF ACTION

### VIOLATION OF RESPA
### (Against all Defendants)

78.     Plaintiff hereby realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

79.     An actual controversy has arisen and now exists between Plaintiff and Defendants regarding their respective rights and duties, in that Plaintiff contends that Defendants did not properly comply with proper delivery procedures under RESPA.

80.     Plaintiff sent a qualified written request ("QWR") and a validation of debt ("VOD") to Defendants on or about October 18, 2011 as permitted under 12 U.S.C §2601 et seq.

81.     The QWR was properly addressed to ONEWEST and the VOD was properly addressed to CAL-WESTERN.

82.     Both the QWR and VOD were sent to Defendants via fax on October 18, 2011. The QWR and VOD were also sent to Defendants certified mail on October 18, 2011. The

/ / /

THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT

confirmation tracking number shows ONEWEST received Plaintiff's QWR on October 21, 2011. A copy of the fax confirmation and certified mail tracking number are attached as Exhibit "G".

83.    The QWR and VOD properly identified Plaintiff, Plaintiff's property, and Loan number to adequately enable Defendants to identify Plaintiff and respond.

84.    Defendants have not responded whatsoever to Plaintiff's QWR and VOD, and therefore has not provided Plaintiff with any of the information requested and required under 12 U.S.C. §2601 et seq.

85.    Defendants' failure to respond whatsoever resulted in Defendants not properly responding and providing a written response acknowledging receipt of the correspondence within 20 days as required under 12 U.S.C. §2605(e)(1)(A).

86.    Defendants further failed to properly respond to Plaintiff's QWR and VOD and provide the information requested as Defendants did not, within 60 days after receipt, after conducting an investigation, provide Plaintiff with a written explanation or clarification that includes information requested by Plaintiff or an explanation of why the information requested is unavailable or cannot be obtained by the servicer and the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower, as required under 12 U.S.C. §2605(e)(2)(C).

87.    In addition, during the 60-day period beginning on the date of the servicer's receipt from Plaintiff of the QWR and VOD relating to the dispute regarding Plaintiff's payments, Defendants were prohibited from providing information regarding any overdue payments, owed by Plaintiff relating to the periods or the QWR and VOD, to any consumer reporting agency, as required under 12 U.S.C. §2605(e)(3).

88.    By Defendants' failure to respond to Plaintiff's QWR and VOD, Defendants have failed to provide Plaintiff with proof of the debt allegedly owed to Defendants, or any other documentation so requested.

89.     Plaintiff requests that this Court find the purported power of sale contained in the Loan of no force and effect at this time, because Defendants' actions in the processing, handling

**THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT**

and attempted foreclosure of this loan has contained violations of regulations created to protect borrowers, which has directly caused Plaintiff to be at an equitable disadvantage to Defendants. Plaintiff further requests that title to the Subject Property remain in Plaintiff's name, with said Deed of Trust remaining in beneficiaries' name, during the pendency of this litigation.

90.     As a result of the Defendants' actions, Plaintiff has suffered damages in excess of $60,000.00, including statutory damages as set forth in 12 U.S.C §2601 et seq., and seeks declaratory relief that Defendants' purported power of sale is void and has no force or effect against the Subject Property.

91.     Further, Defendants' actions have been willful, knowing and malicious, entitlingPlaintiff to punitive damages in an amount appropriate to punish Defendants and to deter others from engaging in the same behavior.

92.     Plaintiff is entitled to such relief as is set forth in this Cause of Action, including punitive damages, and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## FIFTH CAUSE OF ACTION

**VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE §17200, et seq.**
**(Against all Defendants)**

93.     Plaintiff hereby realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

94.     The Unfair Competition Law ("UCL")  defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice." *Cel-Tech Comm., Inc. v. Los Angeles Cellular Tel. Co.* (1999) 20 Cal. 4th 163, 180.

95.     Defendants uniformly engaged in unlawful and unfair practices that was known only to themselves and that could not reasonably have been discovered by Plaintiff as set forth in the preceding counts.

/ / /

/ / /

**THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT**

96.     By engaging in the above-described acts and practices Defendants have committed one or more acts of unlawful and unfair acts within the meaning of Business & Professions Code §§ 17200, et seq.

97.     As a result of the Defendants' unlawful and unfair acts as alleged herein, Plaintiff has suffered injury and lost money and property, including but not limited to the amount of negative amortization resulting from Defendants' scheme.

98.     **Unlawful**: The unlawful acts and practices of Defendants alleged above constitute unlawful business acts and/or practices within the meaning of California Business & Professions Code§§ 17200, et seq. Defendants' unlawful business acts and/or practices as alleged herein have violated numerous laws including state statutory and/or common law - and said predicate acts are therefore per se violations of §17200, et seq.  These predicate unlawful business acts and/or practices include, but are not limited to, the following: California Civil Codes §§ 3333 (Negligence), 2923.5, 2923.6 and other statutory and common law in effect.

99.     Had Defendants properly contacted Plaintiff and evaluated her foreclosure alternatives and her loan modification applications as required by California Law, Plaintiff would not have continued to incur significant fees and penalties on her loan that were forceplaced by Defendants as a result of their unlawful acts.

100.    **Unfair:** Defendants' misconduct as alleged in this action constituted negligence and other tortious conduct and gave Defendants an unfair competitive advantage over their competitors which did not engage in such practices. Said misconduct, as alleged herein, also violated established law and/or public polices which seek to promote avoiding foreclosures. Failing to properly contact Plaintiff and unfairly transferring Plaintiff's proper and legitimate loan modification inquiries and losing Plaintiff's financial documenation as alleged herein, was and is directly contrary to established legislative goals and policies promoting homeownership, avoiding foreclosures and sustaining the economy, and thus, Defendants' acts and/or practices alleged herein were and are unfair within the meaning of Bus. & Prof Code 17200, et seq.

/ / /

THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT

101.    The harm to Plaintiff outweighs the utility, if any, of Defendants' acts and/or practices as alleged herein. Thus, Defendants' deceptive and sharp business acts and/or practices, as alleged herein, were unfair within the meaning of Bus. & Prof Code 17200, et seq.

102.    As alleged herein, Defendants' business acts and practices offend established public policies, including, public policies against making partial half-truths and failing to properly handle Plaintiff's loan modification applications and disclose important material facts regarding the foreclosure of Plaintiff's home, and intentionally deceive Plaintiff into believing they would forebare the foreclosure of Plaintiff's Subject Property.  These practices are and were immoral, unethical, oppressive, unscrupulous and substantially injurious to consumer and thus unfair within the meaning of Bus. & Prof Code 17200, et seq.

103.    At all times relevant, Defendants' misconduct and omissions alleged herein caused: 1) substantial injury to Plaintiff, 2) had no countervailing benefit to consumers or to competition that could possibly outweigh this substantial injury; and 3) caused injury that could not have been avoided or even discovered by ordinary consumers, because it resulted from Defendants' failure to disclose and/or omission of material information that only the Defendants knew or could have known. Thus, Defendants' acts and/or practices as alleged herein were unfair within the meaning of Bus. & Prof Code 17200, et seq.

104.    Defendants also continued to pursue the foreclosure process unlawfully without following proper procedures for nonjudicial foreclosure in violation of Civ. Code §2923.5, as set forth above.

105.    As a direct and proximate result of the aforementioned omissions, acts and/or practices, Defendants received monies and continue to hold the monies expended by Plaintiff who purchased the ARM loan as alleged herein.

106.    The unlawful and unfair, deceptive business acts and practices of Defendants, as fully described herein, present a continuing threat to Plaintiff and members of the public to be misled and/or deceived by Defendants' as alleged herein. Plaintiff and other members of the

/ / /

**THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT**

general public have no other remedy of law that will prevent Defendants' misconduct as alleged herein from occurring and/or reoccurring in the future.

107.    The acts, misrepresentations, omissions, and practices of Defendants alleged above constitute unfair business acts and/or practices within the meaning of California Business and Professions Code Sections 17200, et. seq.

108.    As a direct and proximate result of Defendants' unlawful and unfair conduct alleged herein, Plaintiff has lost thousands of dollars of penalties, interest and fees incurred. Plaintiff is a direct victim of the Defendants' unlawful and unfair conduct, and  Plaintiff has suffered injury in fact, and has lost money or property as a result of Defendants' unfair competition.

109.    Plaintiff justifiably relied on Defendant's acts, misrepresentations, omissions, and practices which was the actual and proximate cause of Plaintiff's damages, including but not limited to all interest paid to Defendants as a result of their unfair, and/or fraudulent business acts and/or practices, in an amount to be proven at trial.

110.    Plaintiff has also incurred copying charges and postal fees in requesting information from Defendants and preparing and sending Defendants the correct material information as detailed herein.  In addition, Plaintiff spent time away from her employment preparing the requested information and attempting to contact Defendants requesting information and inquiring as to the status of her loan modification applications, causing Plaintiff to suffer additional losses, in an amount to be proven at trial.

111.    Defendants' actions in this matter have been willful, knowing, malicious, deceptive and oppressive, entitling Plaintiff to punitive damages in an amount appropriate to punish Defendants and to deter others from engaging in the same behavior.

112.    Plaintiff is entitled to injunctive relief, to such relief as is set forth in this Cause of Action, in excess of $60,000.00, and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

/ / /

THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT

# SIXTH CAUSE OF ACTION

## NEGLIGENCE

### (Against All Defendants)

113.    Plaintiff hereby realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

114.    Defendants owed a general duty of care to Plaintiff in handling his loan in such a way to prevent foreclosure and forfeiture of their property because the transaction was intended to affect Plaintiff, the harm to Plaintiff was certainly foreseeable, and there was a substantial degree of certainty that Plaintiff would suffer injury by forfeiting his home.

115.    Defendants' conduct was closely connected to Plaintiff being thrown into foreclosure without Defendants sincerely exploring foreclosure alternatives with her.

116.    Defendants' conduct was contrary to the state and national policy of sustaining homeownership, savings and retirement and was contrary to preventing said future harm to Plaintiff.

117.    As a consequence, Defendants owed Plaintiff a general duty of care.

118.    Additionally, Congress enacted 15 USC §1639 mandating that all banks servicing home loans were under a duty to act within an industry standard of care as promulgated in various regulations and guidelines.

119.    Those guidelines required Defendants to comply with state consumer protection laws, use consistent methods to determine modification approvals, explore and offer foreclosure alternatives with Plaintiff prior to default and to exercise reasonable care and skill in timely and accurately responding to customer requests and inquires, record proper land records, properly service the loan, and ensure chain of title prior to foreclosing and to stop all foreclosure sales that are unlawful.

120.    The guidelines were aimed at protecting a class of persons, which Plaintiff is a member.

/ / /

**THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT**

121.     As alleged above, Defendants failed to apply consistent methods in offering loan modifications and offering foreclosure alternatives.

122.     As a proximate result, Defendants' breached their duty owed to Plaintiff as generally described above by failing to do the following acts: (1) to comply with state consumer protection laws; (2) to properly service the loan; and (3) to use consistent methods to determine modification approvals.

123.     In or around October 2009,  ONEWEST offered Plaintiff a "Trial Period Plan" loan modification through HAMP.

124.     Plaintiff signed the Plan on October 9, 2009 and returned the signed Agreement to ONEWEST, see Exhibit "B".

125.     Pursuant to the terms of the Plan, Plaintiff was to pay three monthly payments  of $1,159.15 for the months of November 1, 2009 through January 1, 2010 and ONEWEST agreed to forebear all foreclosure activities on the Plaintiff's Subject Property during the terms of the Agreement.  The applicable portion of the Plan 2B reads in part, "[T]he Lender will suspend any scheduled foreclosure sale, provided I continue to meet the obligations under the Plan…" Plaintiff made her first payment to ONEWEST as required pursuant to the Plan on or before November 1, 2009.

126.     Then, without any warning to Plaintiff, on November 4, 2009, just days after Plaintiff performed and made her first payment under the Plan, ONEWEST, through its alleged trustee, CAL-WESTERN, recorded a Notice of Default on the Subject Property.

127.     The act of recording the Notice of Default was in violation of the terms of the Plan set forth in section 2B therein.    In addition, Plaintiff asserts that she was told by representatives of ONEWEST that Defendants would not initiate any foreclosure proceeding unless Plaintiff defaulted under the terms of the Plan.  Plaintiff asserts that she not only made the three (3) trial payments pursuant to the terms of the Plan but continued to make an additional seven (7) payments through September 15, 2010.  All payments were accepted by ONEWEST and applied to the balance of her loan.

**THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT**

128.    In total, Plaintiff made ten consecutive payments to ONEWEST while they continued the foreclosure process in violation of the Plan and without being approved by ONEWEST for a permanent loan modificiation.   A copy of the Customer Account Activity Statement is attached hereto as Exhibit "C".

129.    As a proximate result of Defendants' actions stated herein, Plaintiff has suffered emotional distress in trying to work with Defendants to save his home, credit damage, the potential loss of their real property, and economic loss of the costs of complying with Defendants' demands for paperwork, and attorney fees, all in an amount, or amounts to be proven at trial.

130.    Plaintiff is entitled to such relief as is set forth in this Cause of Action, in excess of $60,000.00, and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants and each of them as follows:

1.      To enjoin the trustee sale of Plaintiff's Subject Property;

2.      For compensatory damages awarded according to proof;

3.      For exemplary and punitive damages according to proof;

4.      For reasonable attorneys' fees and costs of suit;

5.      For an order restraining Defendants from engaging in any further unfair business practices of the type to be proven at the time of trial;

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT**

6.     For a preliminary and permanent injunction staying the foreclosure proceeding pending the outcome of this case; and

7.     For such other and further relief as the court deems just and proper.

Dated: September 18, 2012                    CONSUMER LITIGATION LAW CENTER, APC


                                        By:/s/ *SEPTEMBER J. KATJE*
                                            SEPTEMBER J. KATJE
                                            Attorney for Plaintiff,
                                            ANDREA CHANCELLOR

**THIRD AMENDED COMPLAINT FOR VIOLATION OF CIVIL CODE § 2923.5 AND BREACH OF CONTRACT**

## VERIFICATION

I, ANDREA CHANCELLOR, am the Plaintiff in this action. I have read the complaint and the facts and allegations contained therein are true to the best of my knowledge, except as to those matters stated on information or belief and, as to those matters, I believe them also to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Hayward, CA, on September 18, 2012.

*Andrea Chancellor*

ANDREA CHANCELLOR

27

# EXHIBIT A

Recording Requested By
First American Title
O//0-2486840/3230887

RECORDING REQUESTED BY FIRST AMERICAN TITLE

Recording Requested By:

INDYMAC BANK, F.S.B., C/O DOCUMENT
MANAGEMENT

*[Company Name]*

**And When Recorded Mail To:**

INDYMAC BANK, F.S.B., C/O DOCUMENT
MANAGEMENT

*[Company Name]*

*[Name of Natural Person]*
BLDG B, 901 E 104TH ST, SUITE 400/500

*[Street Address]*
KANSAS CITY, MO 64131

*[City, State Zip Code]*

2007083810          02/26/2007 08:30 AM

OFFICIAL RECORDS OF ALAMEDA COUNTY
PATRICK O'CONNELL
RECORDING FEE:                  73.00

22    PGS

_____ *[Space Above This Line For Recording Data]* _____

# DEED OF TRUST

**MIN:** 100055401255775803

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "**Security Instrument**" means this document, which is dated February 13, 2007 together with all Riders to this document.

**(B)** "**Borrower**" is ANDREA K CHANCELLOR AN UNMARRIED WOMAN

. Borrower is the trustor under this Security Instrument.

**(C)** "**Lender**" is INDYMAC BANK, F.S.B., A FEDERALLY CHARTERED SAVINGS BANK

Lender is a Federal Savings Bank organized and existing under the laws of United States of America . Lender's address is 155 NORTH LAKE AVENUE, PASADENA, CA 91101

**(D)** "**Trustee**" is FIRST AMERICAN TITLE INSURANCE CO.

**(E)** "**MERS**" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

Loan No: 125577580

California Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 1 of 13
MERS Modified Form 3005 01/01
14301CA 08/00
© 2000, The Compliance Source, Inc.



(F) "Note" means the promissory note signed by Borrower and dated February 13, 2007 . The Note states that Borrower owes Lender four hundred thousand and NO/100ths

Dollars (U.S. $ 400,000.00 )

plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than March 1, 2037 .

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower *[check box as applicable]*:

| | | |
|---|---|---|
| [XX] Adjustable Rate Rider | [XX] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] Biweekly Payment Rider |
| [ ] 1-4 Family Rider | [ ] Revocable Trust Rider | |
| [ ] Other(s) *[specify]* | | |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

Loan No: 125577580

California Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 2 of 13

MERS Modified Form 3005 01/01
14301CA 08/00
© 2000, The Compliance Source, Inc.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the     County     of     ALAMEDA    :
                                           *[Type of Recording Jurisdiction]*         *[Name of Recording Jurisdiction]*

    SEE EXHIBIT A ATTACHED HERETO AND MADE A PART HEREOF

Assessor's Identification Number:     4140076112

which currently has the address of             930 BLOSSOM WAY UNIT 5
                                        *[Street]*
        HAYWARD        , California        94541          ("Property Address"):
        *[City]*                            *[Zip Code]*

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any
Loan No: 125577580



payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

Loan No: 125577580



If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds,

Loan No: 125577580



whether·or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or

Loan No: 125577580



obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such



Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this

Loan No: 125577580



Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20.  Sale of Note; Change of Loan Servicer; Notice of Grievance.  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing.  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.  If Applicable Law provides a time period, which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21.  Hazardous Substances.  As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property.  Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property.  If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS.  Borrower and Lender further covenant and agree as follows:
Loan No: 125577580

. 22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_Andrea K. Chancellor_                          (Seal)
ANDREA K. CHANCELLOR                    -Borrower
                                                    *[Printed Name]*

_____          (Seal)
                                                    -Borrower
                                                    *[Printed Name]*

_____          (Seal)
                                                    -Borrower
                                                    *[Printed Name]*

_____          (Seal)
                                                    -Borrower
                                                    *[Printed Name]*

_____ *[Acknowledgment on Following Page]* _____

Loan No: 125577580

California Deed of Trust-Single Family-Fannie Mac/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                          Page 12 of 13
www.compliancesource.com

MERS Modified Form 3005 01/01
14301CA 08/00
© 2000, The Compliance Source, Inc.

# FIXED/ADJUSTABLE RATE RIDER
# INTEREST ONLY PERIOD

**(1-Year LIBOR Index - Rate Caps)**
**(Assumable after Initial Period)**
**( 10 Year Interest Only Period)**

Loan #    125577580                          MIN:    100055401255775803

THIS ADJUSTABLE RATE RIDER is made this 13th day of February, 2007 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure the Borrower's Adjustable Rate Note (the "Note") to
INDYMAC BANK, F.S.B., A FEDERALLY CHARTERED SAVINGS BANK

(the "Lender") of the same date and covering the property described in the Security
Instrument and located at:

930 BLOSSOM WAY UNIT 5, HAYWARD, CA 94541

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE
TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of            6.125        %. The Note
provides for changes in the interest rate and the monthly payments as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of      March, 2012 ,
and may change on that day every 12th month thereafter. Each date on which my interest
rate could change is called a "Change Date."

**IndyMac Bank**
**Fixed/Adjustable Rate Rider - WSJ 1 Yr. Libor - Interest Only Period -**
**Multistate**

Page 1 of 5                                                 **Form 5601**
**8480831** (0506)      VMP Mortgage Solutions, Inc. (800)521-7291              **6/05**

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and 750/1000ths                                        percentage point(s) (          2.750          %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than          11.125   % or less than          2.750          %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than two and N0/1000ths                                        percentage point(s) (          2.000          %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than                          11.125 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.



B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER
    1. UNTIL BORROWER'S INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL BE IN EFFECT AS FOLLOWS:

    Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

    If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

    If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

    2. AFTER BORROWER'S INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION B1 ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND THE PROVISIONS OF UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL BE AMENDED TO READ AS FOLLOWS:

    Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Andrea K. Chancellor_ _____ (Seal)          _____ (Seal)
ANDREA K. CHANCELLOR          -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                            -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                            -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                            -Borrower                                          -Borrower

Loan No: 125577580
8480831  (0506)                    Page 5 of 5                    Form 5601
                                                                      6/05

Order No.: 3230887c
Reference No.: CHANCELLOR
Escrow Officer: TISHA MORRIS
Escrow Number: 2686840

# Exhibit "A"

## DESCRIPTION

All that certain land situated in the unincorporated area of the **County of ALAMEDA, State of California,** and described as follows:

A CONDOMINIUM COMPRISED OF:

PARCEL ONE:

AN UNDIVIDED 1/8TH INTEREST IN AND TO LOT 1, TRACT 6137, FILED JULY 2, 1991, MAP BOOK 197, PAGES 24 THROUGH 26, INCLUSIVE, ALAMEDA COUNTY RECORDS.

EXCEPTING THEREFROM UNITS 1 THROUGH 8, INCLUSIVE, AS SHOWN ON CONDOMINIUM PLAN ATTACHED AS EXHIBIT "A" TO THE DECLARATION OF RESTRICTIONS, RECORDED JULY 26, 1991, 91-195430, ALAMEDA COUNTY RECORDS.

ALSO EXCEPTING THEREFROM THE RIGHT TO POSSESSION, USE AND OCCUPANCY OF THE EXCLUSIVE USE COMMON AREA DESIGNATED AS "P" PATIO ON THE CONDOMINIUM PLAN ABOVE REFERRED TO.

PARCEL TWO:

UNIT 5, AS SHOWN ON THE CONDOMINIUM PLAN ABOVE REFERRED TO.

PARCEL THREE:

THE RIGHT TO POSSESSION, USE AND OCCUPANCY OF THOSE EXCLUSIVE USE COMMON AREAS DESIGNATED "P" 5, ON THE CONDOMINIUM PLAN ABOVE REFERRED TO AS APPURTENANT TO PARCELS ONE AND TWO ABOVE DESCRIBED.

PARCEL FOUR:

AN EASEMENT FOR THE INSTALLATION AND MAINTENANCE OF A SANITARY SEWER PIPELINE OR PIPELINES, OVER, UNDER AND UPON THE NORTHEASTERN 5 FEET, RIGHT ANGLE MEASUREMENTS, OF PARCEL 2, PARCEL MAP 5891, FILED SEPTEMBER 6, 1990, MAP BOOK 191, PAGES 95 THROUGH 97, INCLUSIVE, ALAMEDA COUNTY RECORDS.

PARCEL FIVE

AN EASEMENT FOR THE INSTALLATION AND MAINTENANCE OF A STORM DRAIN, OVER, UNDER AND UPON THE SOUTHWESTERN 8 FEET, RIGHT ANGLE MEASUREMENTS OF PARCEL 2, PARCEL MAP 5891, FILED SEPTEMBER 6, 1990, MAP BOOK 191, PAGES 95 THROUGH 97, INCLUSIVE, ALAMEDA COUNTY RECORDS.

APN No: 414-0076-112

# EXHIBIT B

Reference #: 1009370998T3597

E. Under penalty of perjury, all documents and information I have provided to Lender pursuant to this Plan, including the documents and information regarding my eligibility for the program, are true and correct; and

F. If Lender requires me to obtain credit counseling, I will do so.

2. **The Trial Period Plan.** On or before each of the following due dates, I will pay the Lender the amount set forth below ("Trial Period Payment"), which includes payment for Escrow Items, including real estate taxes, insurance premiums and other fees, if any, of U.S. $280.46.

| Trial Period Payment # | Trial Period Payment | Due Date On or Before |
|---|---|---|
| 1* | $1,159.15 | 11/1/2009* |
| 2 | $1,159.15 | 12/1/2009 |
| 3 | $1,159.15 | 1/1/2010 |

The Trial Period Payment is an estimate of the payment that will be required under the modified loan terms, which may be finalized in accordance with Section 3 below. The actual payments under the modified loan terms, however, may be different.

*I understand that my first payment and this signed Trial Period Plan must be received by the Lender no later than 11/1/2009 or I may not be accepted into the Home Affordable Modification Program.

I agree that during the period (the "Trial Period") commencing on the Trial Period Effective Date and ending on the earlier of: (i) the first day of the month following the month in which the last Trial Period Payment is due (the "Modification Effective Date") or (ii) termination of this Plan, I understand and acknowledge that:

A. TIME IS OF THE ESSENCE under this Plan. This means I must make all payments on or before the days that they are due;

B. Except as set forth in Section 2.C. below, the Lender will suspend any scheduled foreclosure sale, provided I continue to meet the obligations under this Plan, but any pending foreclosure action will not be dismissed and may be immediately resumed from the point at which it was suspended if this Plan terminates, and no new notice of default, notice of intent to accelerate, notice of acceleration, or similar notice will be necessary to continue the foreclosure action. All rights to such notices are hereby waived by me to the extent permitted by applicable law;

C. If my property is located in Georgia, Hawaii, Missouri, or Virginia and a foreclosure sale is currently scheduled, the foreclosure sale will not be suspended and the Lender may foreclose if I have not made each and every Trial Period Payment that is due through the end of the month preceding the month in which the foreclosure sale is scheduled to occur. If a foreclosure sale occurs pursuant to this Section 2.C., this plan · shall be deemed terminated;

D. The Lender will hold the payments received during the Trial Period in a non-interest bearing account until they total an amount that is enough to pay my oldest delinquent monthly payment on my loan in full. I understand the Lender will not pay me interest on the amounts held in the account. If there is any remaining money after such payment is applied, such remaining funds will be held by the Lender and not posted to my account until they total an amount that is enough to pay the next oldest delinquent monthly payment in full;

E. When the Lender accepts and posts a payment during the Trial Period it will be without prejudice to, and will. not be deemed a waiver of, the acceleration of the loan or foreclosure action and related activities and shall not constitute a cure of my default under the Loan Documents unless such payments are sufficient to completely cure my entire default under the Loan Documents;

F. If prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; (iii) the Lender determines that any of my representations in Section 1 were not true and correct as of the date I signed this Plan or are no longer true and correct at any time during the Trial Period; or (iv) I do not provide all information and documentation required by the Lender, the Loan Documents will not be modified and this Plan will terminate. In this event, the Lender will have all of the rights and remedies provided by the Loan Documents, and any payment I make under this Plan shall be applied to amounts I owe under the Loan Documents and shall not be refunded to me; and

F. That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. I understand and consent to the disclosure of my personal information and the terms of this Trial Period Plan and the Modification Agreement by Lender to (a) the U.S. Department of the Treasury, (b) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (c) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien in connection with their responsibilities under the Home Affordable Modification Program and the Second Lien companies that perform support services for the Home Affordable Modification Program; and (e) any HUD certified housing counselor.

Reference #: 1009370998T359;

G. That, as of the Trial Period Plan Effective Date, I understand that the Lender will only allow the transfer and assumption of this Trial Period Plan to a transferee of my property in the case of my death, divorce or marriage to the same extent as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. This Plan may not, under any other circumstances, be assigned to, or assumed by, a buyer or transferee of the Property.

H. Notwithstanding anything herein to the contrary, if my final two Trial Period Payments are received by Servicer after the close of business on the 15th calendar day of the last month of the Trial Period but before the end of the Trial Period, I agree that the Trial Period shall be extended by one calendar month (the "Additional Trial Period"). I agree to abide by all terms and provisions of this Trial Period Plan during the Additional Trial Period. In addition, I agree to make a Trial Period Payment in the amount of $1,159.15 no more than 30 days after the last due date listed in the chart in Section 2 above.

In Witness Whereof, the Lender and I have executed this Plan.

IndyMac Mortgage Services, a Division of OneWest Bank, FSB

Lender

By: _____

Michael Stanford, First Vice President

Date _____

_Andrea K Chancellor_
Andrea K Chancellor

_10/9/09_
Date

_____
Date

**EXHIBIT C**

ONE WEST BANK, FSB
HOME LOAN SERVICING
P.O. BOX 4045
KALAMAZOO, MICHIGAN 49003-4045
1-800-781-7399

REQ BY 79C

CUSTOMER ACCOUNT ACTIVITY STATEMENT

DATE 10/24/11
PAGE   5

ANDREA K CHANCELLOR
LOAN NUMBER: 1009370998

ACTIVITY FOR PERIOD 10/01/09 - 10/21/11

| PROCESS DATE | DUE DATE | TRANSACTION CODE | TRANSACTION DESCRIPTION | | | EFFECTIVE DATE OF TRANSACTION |
|---|---|---|---|---|---|---|
| TRANSACTION AMOUNT | PRIN. PAID/ BALANCE | INTEREST | ESCROW PAID/ BALANCE | AMOUNT | OTHER CODE/DESCRIPTION | |
| 05-25-10 09-09 | 173 | PAYMENT | | | | 05-24-10 |
| 0.00 | 0.00 | 2,041.64 | 240.33 | 2,281.97- | | |
| | | | | 5100.68- | NEW PRINCIPAL/ESCROW BALANCES | |
| 05-24-10 09-09 | 173 | PAYMENT | | | | |
| 1,159.15 | 0.00 | 0.00 | 0.00 | 1,159.15 ✓ | | |
| 05-24-10 00-00 | 632 | STATUTORY EXPENSES | | | | |
| 174.88 | 0.00 | 0.00 | 0.00 | | | |
| 05-24-10 00-00 | 632 | STATUTORY EXPENSES | | | | |
| 350.00 | 0.00 | 0.00 | 0.00 | | | |
| 05-24-10 00-00 | 632 | STATUTORY EXPENSES | | | | |
| 39.00 | 0.00 | 0.00 | 0.00 | | | |
| 05-24-10 00-00 | 630 | ATTORNEY ADVANCES | | | | |
| 555.00 | 0.00 | 0.00 | 0.00 | | | |
| 05-17-10 09-09 | 152 | LATE CHARGE ASSESSMENT | | | | |
| 0.00 | 0.00 | 0.00 | 0.00 | | 102.08-1 LATE CHARGE | |
| 04-13-10 09-09 | 173 | PAYMENT | | | | |
| 1,159.15 | 0.00 | 0.00 | 0.00 | 1,159.15 ✓ | | |
| 04-02-10 09-09 | 161 | ESCROW ADVANCE | | | | |
| 1,502.34 | 0.00 | 0.00 | 1502.34 | | | |
| 04-02-10 03-10 | 312 | COUNTY TAX | | | | |
| 1,502.34- | 0.00 | 0.00 | 1502.34- | | | |
| | | | | 5341.01- | NEW PRINCIPAL/ESCROW BALANCES | |
| 03-15-10 09-09 | 173 | PAYMENT | | | | |
| 0.00 | 0.00 | 0.00 | 0.00 | | | |
| 03-15-10 08-09 | 168 | REPAY OF ESCROW ADVANCE | | | | |
| 0.00 | 0.00 | 0.00 | 240.33- | 240.33 | | |
| 03-15-10 08-09 | 173 | PAYMENT | | | | |
| 0.00 | 0.00 | 2,041.64 | 240.33 | 2,281.97- | | |
| | | | | 3838.67- | NEW PRINCIPAL/ESCROW BALANCES | |
| 03-10-10 08-09 | 173 | PAYMENT | | | | |
| 1,159.15 | 0.00 | 0.00 | 0.00 | 1,159.15 ✓ | | |
| 01-26-10 00-00 | 633 | MISC. F/C AND B/R EXPENSES | | | | |
| 11.00 | 0.00 | 0.00 | 0.00 | | | |
| 01-19-10 08-09 | 152 | LATE CHARGE ASSESSMENT | | | | |
| 0.00 | 0.00 | 0.00 | 0.00 | | 102.08-1 LATE CHARGE | |
| 12-28-09 08-09 | 173 | PAYMENT | | | | |
| 1,159.15 | 0.00 | 0.00 | 0.00 | 1,159.15 ✓ | | |

```
                        ONE WEST BANK, FSB
                     HOME LOAN SERVICING
                        P.O. BOX 4045
                 KALAMAZOO, MICHIGAN 49003-4045
                        1-800-781-7399
```

REQ BY 79C           CUSTOMER ACCOUNT ACTIVITY STATEMENT           DATE 10/24/11
                                                                        PAGE   4

ANDREA K CHANCELLOR
LOAN NUMBER: 1009370998

```
                    ACTIVITY FOR PERIOD 10/01/09 - 10/21/11
PROCESS     DUE     TRANSACTION          TRANSACTION
DATE        DATE    CODE                 DESCRIPTION              EFFECTIVE DATE
                                                                 OF TRANSACTION
----------------------------------------------------------------------------------
 TRANSACTION  PRIN. PAID/          ESCROW PAID/ -----------OTHER-------------
  AMOUNT       BALANCE    INTEREST   BALANCE    AMOUNT  CODE/DESCRIPTION
----------------------------------------------------------------------------------
09-14-10  00-00  632  STATUTORY EXPENSES
     150.00        0.00      0.00      0.00
09-14-10  00-00  630  ATTORNEY ADVANCES
     500.00        0.00      0.00      0.00
08-20-10  00-00  632  STATUTORY EXPENSES
      21.00        0.00      0.00      0.00
08-17-10  11-09  173  PAYMENT
   1,159.15        0.00      0.00      0.00    1,159.15 ✓
08-16-10  11-09  152  LATE CHARGE ASSESSMENT
       0.00        0.00      0.00      0.00     102.08-1 LATE CHARGE
07-28-10  00-00  630  ATTORNEY ADVANCES
      35.00        0.00      0.00      0.00
07-19-10  11-09  173  PAYMENT
       0.00        0.00      0.00      0.00
07-19-10  10-09  168  REPAY OF ESCROW ADVANCE
       0.00        0.00      0.00    240.33-    240.33
07-19-10  10-09  173  PAYMENT
       0.00        0.00   2,041.64   240.33   2,281.97-                 07-16-10
                                     4860.35-  NEW PRINCIPAL/ESCROW BALANCES
07-17-10  10-09  173  PAYMENT
       0.00        0.00      0.00      0.00
07-16-10  10-09  152  LATE CHARGE ASSESSMENT
       0.00        0.00      0.00      0.00     102.08-1 LATE CHARGE
07-16-10  10-09  173  PAYMENT
   1,159.15        0.00      0.00      0.00    1,159.15 ✓
06-16-10  10-09  152  LATE CHARGE ASSESSMENT
       0.00        0.00      0.00      0.00     102.08-1 LATE CHARGE
06-16-10  10-09  173  PAYMENT
   1,159.15        0.00      0.00      0.00    1,159.15 ✓
06-07-10  00-00  633  MISC. F/C AND B/R EXPENSES
      11.00        0.00      0.00      0.00
06-04-10  00-00  630  ATTORNEY ADVANCES
     200.00        0.00      0.00      0.00
05-25-10  10-09  173  PAYMENT
       0.00        0.00      0.00      0.00
05-25-10  09-09  168  REPAY OF ESCROW ADVANCE
       0.00        0.00      0.00    240.33-    240.33
```

```
                         ONE WEST BANK, FSB
                       HOME LOAN SERVICING
                          P.O. BOX 4045
                    KALAMAZOO, MICHIGAN 49003-4045
                          1-800-781-7399

                  CUSTOMER ACCOUNT ACTIVITY STATEMENT          DATE 10/24/11
REQ BY 79C                                                     PAGE    3

ANDREA K CHANCELLOR
LOAN NUMBER: 1009370998

                   ACTIVITY FOR PERIOD 10/01/09 - 10/21/11
PROCESS    DUE     TRANSACTION              TRANSACTION              EFFECTIVE DATE
DATE       DATE    CODE                     DESCRIPTION              OF TRANSACTION
-----------------------------------------------------------------------------------
  TRANSACTION   PRIN. PAID/          ESCROW PAID/ ------------OTHER-------------
    AMOUNT       BALANCE    INTEREST   BALANCE   AMOUNT  CODE/DESCRIPTION
-----------------------------------------------------------------------------------
02-16-11  00-00  632  STATUTORY EXPENSES
    878.07         0.00       0.00      0.00
01-19-11  00-00  633  MISC. F/C AND B/R EXPENSES
     11.00         0.00       0.00      0.00
01-18-11  12-09  152  LATE CHARGE ASSESSMENT
      0.00         0.00       0.00      0.00     102.08-1 LATE CHARGE
12-22-10  00-00  633  MISC. F/C AND B/R EXPENSES
     11.00         0.00       0.00      0.00
12-16-10  12-09  152  LATE CHARGE ASSESSMENT
      0.00         0.00       0.00      0.00     102.08-1 LATE CHARGE
11-23-10  00-00  633  MISC. F/C AND B/R EXPENSES
     11.00         0.00       0.00      0.00
11-17-10  12-09  161  ESCROW ADVANCE
  1,479.28         0.00       0.00   1479.28
11-17-10  11-10  312  COUNTY TAX
  1,479.28-        0.00       0.00   1479.28-
                                     5282.98-  NEW PRINCIPAL/ESCROW BALANCES
11-16-10  12-09  152  LATE CHARGE ASSESSMENT
      0.00         0.00       0.00      0.00     102.08-1 LATE CHARGE
10-19-10  00-00  633  MISC. F/C AND B/R EXPENSES
     11.00         0.00       0.00      0.00
10-18-10  12-09  152  LATE CHARGE ASSESSMENT
      0.00         0.00       0.00      0.00     102.08-1 LATE CHARGE
10-08-10  12-09  168  REPAY OF ESCROW ADVANCE
      0.00         0.00       0.00    816.32-    816.32
10-08-10  12-09  173  PAYMENT
      0.00         0.00       0.00    816.32     816.32-
                                     3803.70-  NEW PRINCIPAL/ESCROW BALANCES
09-16-10  12-09  173  PAYMENT
      0.00         0.00       0.00      0.00
09-16-10  11-09  168  REPAY OF ESCROW ADVANCE
      0.00         0.00       0.00    240.33-    240.33
09-16-10  11-09  173  PAYMENT
      0.00         0.00     2,041.64   240.33   2,281.97-
                                     4620.02-  NEW PRINCIPAL/ESCROW BALANCES
09-15-10  11-09  173  PAYMENT
  1,179.15         0.00       0.00      0.00      20.00 0 E BILL-PAY C/S
                                              1,159.15
```

```
                        ONE WEST BANK, FSB
                     HOME LOAN SERVICING
                        P.O. BOX 4045
                 KALAMAZOO, MICHIGAN 49003-4045
                        1-800-781-7399
```

REQ BY 79C                CUSTOMER ACCOUNT ACTIVITY STATEMENT          DATE 10/24/11
                                                                          PAGE   2

ANDREA K CHANCELLOR
LOAN NUMBER: 1009370998

```
                      ACTIVITY FOR PERIOD 10/01/09 - 10/21/11
PROCESS    DUE     TRANSACTION            TRANSACTION
DATE      DATE     CODE                   DESCRIPTION                    EFFECTIVE DATE
                                                                        OF TRANSACTION
-----------------------------------------------------------------------------------
TRANSACTION   PRIN. PAID/          ESCROW PAID/  ------------OTHER-------------
AMOUNT        BALANCE   INTEREST    BALANCE    AMOUNT  CODE/DESCRIPTION
-----------------------------------------------------------------------------------
05-02-11  00-00  766  MISC. REPAYMENT
   730.00          0.00      0.00     0.00
05-02-11  12-09  168  REPAY OF ESCROW ADVANCE
    0.00           0.00      0.00   6762.26-  6,762.26
05-02-11  12-09  166  MISCELLANEOUS ESCROW DEPOSIT
 8,991.38          0.00      0.00   8991.38
                                    2229.12   NEW PRINCIPAL/ESCROW BALANCES
03-29-11  00-00  633  MISC. F/C AND B/R EXPENSES
    11.00          0.00      0.00     0.00
03-25-11  00-00  632  STATUTORY EXPENSES
    25.00          0.00      0.00     0.00
03-25-11  00-00  632  STATUTORY EXPENSES
    60.74          0.00      0.00     0.00
03-25-11  00-00  632  STATUTORY EXPENSES
   774.95          0.00      0.00     0.00
03-25-11  00-00  632  STATUTORY EXPENSES
    42.00          0.00      0.00     0.00
03-25-11  00-00  632  STATUTORY EXPENSES
    18.00          0.00      0.00     0.00
03-25-11  00-00  630  ATTORNEY ADVANCES
   150.00          0.00      0.00     0.00
03-17-11  12-09  161  ESCROW ADVANCE
 1,479.28          0.00      0.00   1479.28
03-17-11  03-11  312  COUNTY TAX
 1,479.28-         0.00      0.00   1479.28-
                                    6762.26-  NEW PRINCIPAL/ESCROW BALANCES
03-16-11  12-09  152  LATE CHARGE ASSESSMENT
    0.00           0.00      0.00     0.00    102.08-1 LATE CHARGE
03-01-11  00-00  633  MISC. F/C AND B/R EXPENSES
    11.00          0.00      0.00     0.00
02-16-11  12-09  152  LATE CHARGE ASSESSMENT
    0.00           0.00      0.00     0.00    102.08-1 LATE CHARGE
02-16-11  00-00  632  STATUTORY EXPENSES
    18.00          0.00      0.00     0.00
02-16-11  00-00  632  STATUTORY EXPENSES
    42.00          0.00      0.00     0.00
```

```
                         ONE WEST BANK, FSB
                       HOME LOAN SERVICING
                          P.O. BOX 4045
                     KALAMAZOO, MICHIGAN 49003-4045
                          1-800-781-7399

REQ BY 79C           CUSTOMER ACCOUNT ACTIVITY STATEMENT        DATE 10/24/11
                                                               PAGE    1

ANDREA K CHANCELLOR              THE FOLLOWING IS THE PAYMENT HISTORY YOU
930 BLOSSOM WAY UNIT 5           REQUESTED.  SHOULD YOU HAVE ANY QUESTIONS
HAYWARD             CA 94541     REGARDING THIS HISTORY, PLEASE CALL THE
                                 CUSTOMER SERVICE DEPARTMENT AT THE ABOVE
                                 REFERENCED TELEPHONE NUMBER.  THANK YOU.

LOAN NUMBER: 1009370998
*************************************************************************
----------------------- CURRENT ACCOUNT INFORMATION --------------------
   DATE         TOTAL       PRINCIPAL        LOAN      CURRENT
 PAYMENT       PAYMENT      & INTEREST     INTEREST    PRINCIPAL
   DUE         AMOUNT        PAYMENT         RATE       BALANCE        ESCROW
                                                                      BALANCE
 12-01-09     2,281.97      2,041.64       6.12500    399,995.00     6,762.26-
*************************************************************************
```

```
                    ACTIVITY FOR PERIOD 10/01/09 - 10/21/11
PROCESS     DUE    TRANSACTION              TRANSACTION
 DATE       DATE   CODE                     DESCRIPTION            EFFECTIVE DATE
                                                                 OF TRANSACTION
------------------------------------------------------------------------
 TRANSACTION   PRIN. PAID/         ESCROW PAID/ -----------OTHER-------------
   AMOUNT       BALANCE    INTEREST   BALANCE   AMOUNT  CODE/DESCRIPTION
------------------------------------------------------------------------
08-16-11  12-09  152  LATE CHARGE ASSESSMENT
      0.00        0.00        0.00        0.00     102.08-1 LATE CHARGE
08-08-11  00-00  633  MISC. F/C AND B/R EXPENSES
     11.00        0.00        0.00        0.00
07-26-11  12-09  161  ESCROW ADVANCE
   6,762.26       0.00        0.00     6762.26
07-26-11  00-00  766  MISC. REPAYMENT
   8,991.38       0.00        0.00        0.00
07-25-11  12-09  147  MISAPPLICATION REVERSAL
      0.00        0.00        0.00     8991.38-
                                       6762.26-   NEW PRINCIPAL/ESCROW BALANCES
07-18-11  12-09  152  LATE CHARGE ASSESSMENT
      0.00        0.00        0.00        0.00     102.08-1 LATE CHARGE
07-06-11  00-00  633  MISC. F/C AND B/R EXPENSES
     11.00        0.00        0.00        0.00
06-24-11  00-00  745  CORP. ADVANCE ADJUSTMENT
   8,991.38       0.00        0.00        0.00
06-24-11  00-00  745  CORP. ADVANCE ADJUSTMENT
   4,077.68       0.00        0.00        0.00
06-24-11  00-00  745  CORP. ADVANCE ADJUSTMENT
   8,991.38-      0.00        0.00        0.00
06-24-11  00-00  745  CORP. ADVANCE ADJUSTMENT
   4,077.68-      0.00        0.00        0.00
05-17-11  00-00  766  MISC. REPAYMENT
   3,347.68       0.00        0.00        0.00
```

**EXHIBIT   D**

DISMISSED, DebtEd, CLOSED, APPEAL

# U.S. Bankruptcy Court
## Northern District of California (Oakland)
## Bankruptcy Petition #: 10-40906

|  |  |
|---|---|
| | *Date filed:* 01/28/2010 |
| *Assigned to:* Judge Edward D. Jellen | *Date* 05/26/2010 |
| Chapter 13 | *terminated:* |
| Voluntary | *Debtor* 03/17/2010 |
| Asset | *dismissed:* |

*Debtor disposition:* Dismissed for Failure to File Information

| | |
|---|---|
| *Debtor* | represented by **Michael P. Akana** |
| **Andrea K. Chancellor** | Law Offices of Michael P. Akana |
| 930 Blossom Way #5 | 225 W Winton Ave. #111 |
| Hayward, CA 94541 | Hayward, CA 94544 |
| ALAMEDA-CA | (510)782-1100 |
| SSN / ITIN: xxx-xx-1512 | Email: mikemikeakana@gmail.com |

*Trustee*
**Martha G. Bronitsky**
P.O. Box 5004
Hayward, CA 94540-5004
510-266-5580

*U.S. Trustee*
**Office of the U.S. Trustee/Oak**
Office of the U.S. Trustee
1301 Clay St. #690N
Oakland, CA 94612
(510) 637-3200

| Filing Date | # | Docket Text |
|---|---|---|
| | | Chapter 13 Voluntary Petition, Fee Amount $274. Filed |

| | | |
|---|---|---|
| 01/28/2010 | 1 | by Andrea K. Chancellor . Incomplete Filings due by 2/11/2010. Section 521 Filings due by 3/15/2010. Order Meeting of Creditors due by 3/1/2010. Chapter 13 Plan due by 2/11/2010. CERTIFICATE OF CREDIT COUNSELING IS NOT ON FILE. (cog) (Entered: 01/28/2010) |
| 01/28/2010 | | Receipt of Filing Fee for Chapter 13 Voluntary Petition. Amount 274.00 from Andrea Chancellor. Receipt Number 40069256. (admin) (Entered: 01/28/2010) |
| 01/28/2010 | 2 | Statement of Social Security Number. Filed by Debtor Andrea K. Chancellor (pl) (Entered: 01/29/2010) |
| 01/29/2010 | 3 | Order To File Required Documents and Notice Regarding Dismissal . Non-Compliance (Documents) due by 2/12/2010 Chapter 13 Plan due by 2/12/2010 (pl) (Entered: 01/29/2010) |
| 01/31/2010 | 4 | BNC Certificate of Mailing (RE: related document(s)3 Order to File Missing Documents). Service Date 01/31/2010. (Admin.) (Entered: 01/31/2010) |
| 02/12/2010 | 5 | Meeting of Creditors with Certificate of Service. 341(a) meeting to be held on 4/8/2010 at 10:00 AM Oakland U.S. Trustee Office Objection to Dischargeability due by 6/7/2010 Proofs of Claims due by 7/7/2010 (Bronitsky, Martha (dk)) (Entered: 02/12/2010) |
| 02/18/2010 | 6 | BNC Certificate of Mailing - Meeting of Creditors. (RE: related document(s)5 Meeting of Creditors Chapter 13). Service Date 02/18/2010. (Admin.) (Entered: 02/18/2010) |
| 02/18/2010 | 8 | Motion to Extend Time Filed by Debtor Andrea K. Chancellor (pl) (Entered: 02/19/2010) |
| | | Motion to Dismiss Case *Trustees Motion and* |

| | | |
|---|---|---|
| 02/19/2010 | 7 | *Declaration to Dismiss Proceedings and Certificate of Service* Filed by Trustee Martha G. Bronitsky (Bronitsky, Martha (harbor)) (Entered: 02/19/2010) |
| 02/23/2010 | 9 | Amended Voluntary Petition. Filed by Debtor Andrea K. Chancellor (Akana, Michael) Modified on 2/24/2010 WRONG PDF IS ATTACHED, THE DOCUMENT IS A CERTIFICATE OF CREDIT COUNSELING (pl). (Entered: 02/23/2010) |
| 02/23/2010 | 10 | Certificate of Credit Counseling Filed by Debtor Andrea K. Chancellor (Akana, Michael) (Entered: 02/23/2010) |
| 02/25/2010 | 11 | Order Granting Motion to Extend Time (Related Doc # 8) Non-Compliance (Documents) due by 3/4/2010 for 3, Chapter 13 Plan due by 3/4/2010 for 3, (pl) (Entered: 02/25/2010) |
| 02/26/2010 | 12 | Amendment to List of Creditors . Fee Amount $26 Filed by Debtor Andrea K. Chancellor (Akana, Michael) Modified on 3/1/2010 WRONG PDF ATTACHED (pl). (Entered: 02/26/2010) |
| 02/26/2010 | | Receipt of filing fee for Amended Creditor Matrix (Fee)(10-40906) [misc,amdcm] ( 26.00). Receipt number 10261687, amount $ 26.00 (U.S. Treasury) (Entered: 02/26/2010) |
| 02/26/2010 | 13 | Amended Schedule A, Schedule B, Schedule C, Schedule G, Schedule H, Schedule I, Schedule J. Filed by Debtor Andrea K. Chancellor (Akana, Michael) (Entered: 02/26/2010) |
| 02/26/2010 | 14 | Amended Schedule D Schedule E Schedule F . Fee Amount $26. Filed by Debtor Andrea K. Chancellor (Akana, Michael) (Entered: 02/26/2010) |
| | | Receipt of filing fee for Amended Schedules (D, E, and F - Fee Required)(10-40906) [misc,amdsch] ( 26.00). |

| | | |
|---|---|---|
| 02/26/2010 | | Receipt number 10261731, amount $ 26.00 (U.S. Treasury) (Entered: 02/26/2010) |
| 02/26/2010 | 15 | Chapter 13 Statement of Current Monthly and Disposable Income (Form 22C) Filed by Debtor Andrea K. Chancellor (Akana, Michael) (Entered: 02/26/2010) |
| 02/26/2010 | 16 | Disclosure of Compensation of Attorney for Debtor in the Amount of $ 500 Filed by Debtor Andrea K. Chancellor (Akana, Michael) (Entered: 02/26/2010) |
| 02/26/2010 | 17 | Chapter 13 Plan Filed by Debtor Andrea K. Chancellor (RE: related document(s)3 Order to File Missing Documents). (Akana, Michael) (Entered: 02/26/2010) |
| 02/26/2010 | 18 | Statement of Financial Affairs (RE: related document(s)3 Order to File Missing Documents). Filed by Debtor Andrea K. Chancellor (Akana, Michael) (Entered: 02/26/2010) |
| 02/26/2010 | 19 | Creditor Matrix Filed by Debtor Andrea K. Chancellor (Akana, Michael) (Entered: 02/26/2010) |
| 02/26/2010 | 20 | Payment Advices Filed by Debtor Andrea K. Chancellor (Akana, Michael) (Entered: 02/26/2010) |
| 02/27/2010 | 21 | BNC Certificate of Mailing (RE: related document(s)11 Order on Motion to Extend Time). Service Date 02/27/2010. (Admin.) (Entered: 02/27/2010) |
| 03/01/2010 | 22 | Chapter 13 Plan Filed by Debtor Andrea K. Chancellor. (Akana, Michael) (Entered: 03/01/2010) |
| 03/08/2010 | 23 | Request for Notice Filed by Creditor CHASE HOME FINANCE, LLC (Damen, Jonathan) Modified on 3/9/2010 ERROR: PARTY INFORMATION WAS ENTERED IN ALL CAPS (pl). (Entered: 03/08/2010) |

| | | |
|---|---|---|
| 03/09/2010 | 24 | Request for Notice Filed by Creditor GE Money Bank. (Singh, Ramesh) (Entered: 03/09/2010) |
| 03/15/2010 | 25 | Declaration *of Martha G. Bronitsky, Chapter 13 Trustee and Request for Order of Dismissal with Certificate of Service.* (RE: related document(s)7 Motion to Dismiss Case). Filed by Trustee Martha G. Bronitsky (Bronitsky, Martha (harbor)) (Entered: 03/15/2010) |
| 03/15/2010 | 26 | Notice of Appearance and Request for Notice by Dean Prober. Filed by Creditor BAC Home Loans Servicing, LP (Prober, Dean) (Entered: 03/15/2010) |
| 03/17/2010 | 27 | Order Granting Motion to Dismiss Case (Related Doc # 7) (pl) (Entered: 03/17/2010) |
| 03/19/2010 | 28 | BNC Certificate of Mailing - Notice of Dismissal. (RE: related document(s)27 Order on Motion to Dismiss Case). Service Date 03/19/2010. (Admin.) (Entered: 03/19/2010) |
| 03/19/2010 | 29 | BNC Certificate of Mailing (RE: related document(s)27 Order on Motion to Dismiss Case). Service Date 03/19/2010. (Admin.) (Entered: 03/19/2010) |
| 05/21/2010 | 30 | Chapter 13 Trustee Final Report and Account . (Bronitsky, Martha (harbor)) (Entered: 05/21/2010) |
| 05/25/2010 | 31 | Order Discharging Chapter 13 Trustee. (nw) (Entered: 05/25/2010) |
| 05/26/2010 | | Bankruptcy Case Closed. (tw) (Entered: 05/26/2010) |
| 05/27/2010 | 32 | BNC Certificate of Mailing - Electronic Order (RE: related document(s)31 Order Discharging Chapter Trustee). Service Date 05/27/2010. (Admin.) (Entered: 05/27/2010) |
| | | Receipt of Reopen Chapter 13 Filing Fee. Amount |

| | | |
|---|---|---|
| 07/02/2010 | | 235.00 from Andrea K. Chancellor. Receipt Number 40071929. (admin) (Entered: 07/02/2010) |
| 07/02/2010 | <u>33</u> | Motion to Reopen Chapter 13 Case . Fee Amount $235 Filed by Debtor Andrea K. Chancellor (nw) (Entered: 07/06/2010) |
| 07/08/2010 | <u>34</u> | Order Denying Motion To Vacate Dismissal and Reopen Case (Related Doc # <u>33</u>) (nw) (Entered: 07/08/2010) |
| 07/08/2010 | <u>35</u> | Motion to Reconsider (RE: related document(s)<u>33</u> Motion to Reopen Chapter 7/13 Case filed by Debtor Andrea K. Chancellor). Filed by Debtor Andrea K. Chancellor (Akana, Michael) ERROR: FILING FEE FOR MOTION TO REOPEN NOT PAID. PMT DUE NOW. Modified on 7/12/2010 (nw). (Entered: 07/08/2010) |
| 07/09/2010 | <u>37</u> | Motion to Reconsider Order Denying Motion to Vacate Dismissal , Motion to Reopen Chapter 13 Case . Fee Amount $235 (RE: related document(s)<u>34</u> Order on Motion to Reopen Chapter 7/13 Case) . Filed by Debtor Andrea K. Chancellor (Attachments: <u>1</u> Exhibit A<u>2</u> Exhibit B<u>3</u> Exhibit C<u>4</u> Exhibit D<u>5</u> Exhibit E<u>6</u> Certificate of Service) (nw) DUPLICATE OF DOC# 35. THIS HAS EXHIBITS INCLUDED. FILING FEE FOR MOTION TO REOPEN NOT PAID. Modified on 7/12/2010 (nw). (Entered: 07/12/2010) |
| 07/10/2010 | <u>36</u> | BNC Certificate of Mailing (RE: related document(s)<u>34</u> Order on Motion to Reopen Chapter 7/13 Case). Service Date 07/10/2010. (Admin.) (Entered: 07/10/2010) |
| 07/16/2010 | <u>38</u> | Order Denying Motion To Reconsider (Related Doc # <u>35</u>), Denying Motion To Reconsider (Related Doc # <u>37</u>), Denying Motion To Reopen Chapter 7/13 Case (Related Doc # <u>37</u>) (nw) (Entered: 07/16/2010) |

| | | |
|---|---|---|
| 07/18/2010 | 39 | BNC Certificate of Mailing (RE: related document(s)38 Order on Motion to Reconsider). Service Date 07/18/2010. (Admin.) (Entered: 07/18/2010) |
| 07/21/2010 | 40 | Notice of Appeal to BAP , Fee Amount $ 255. (RE: related document(s)38 Order on Motion to Reconsider, Order on Motion to Reconsider, Order on Motion to Reopen Chapter 7/13 Case). Appellant Designation due by 08/4/2010. Transmission to BAP due by 07/26/2010. Filed by Debtor Andrea K. Chancellor (Akana, Michael) (Entered: 07/21/2010) |
| 07/21/2010 | | Receipt of filing fee for Notice of Appeal(10-40906) [appeal,ntcapl] ( 255.00). Receipt number 11292697, amount $ 255.00 (U.S. Treasury) (Entered: 07/21/2010) |
| 08/03/2010 | 41 | Notice of Referral of Appeal to Bankruptcy Appellant Panel (RE: related document(s)40 Notice of Appeal). (pw) (Entered: 08/03/2010) |
| 08/03/2010 | 42 | Transmission of Notice of Appeal to BAP (RE: related document(s)40 Notice of Appeal). (pw) (Entered: 08/03/2010) |
| 09/20/2010 | 43 | Motion to Extend Time Filed by Debtor Andrea K. Chancellor (Akana, Michael) (Entered: 09/20/2010) |
| 09/29/2010 | 44 | Conditional Order of Dismissal (RE: related document(s)40 Notice of Appeal filed by Debtor Andrea K. Chancellor). (pw) (Entered: 10/26/2010) |
| 10/22/2010 | 45 | Order to Dismiss Appeal (RE: related document(s)40 Notice of Appeal filed by Debtor Andrea K. Chancellor). (pw) (Entered: 10/26/2010) |

2/30/11

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/30/2011 08:46:56 | | | |
| **PACER Login:** | cl4495 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 10-40906 Fil or Ent: filed From: 10/31/2009 To: 12/30/2011 Doc From: 0 Doc To: 99999999 Term: included Headers: included Format: html |
| **Billable Pages:** | 7 | **Cost:** | 0.56 |

**EXHIBIT   E**

Entered on Docket
May 26, 2010
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

Signed: May 25, 2010

EDWARD D. JELLEN
U.S. Bankruptcy Judge

1 Law Offices of Farley & Kump, LLP
  Kary Kump, Bar No. 103335
2 570 Poli Street
  P.O. Box 2480
3 Ventura, CA 93002-2480
  (805) 585-1831
4 (805) 585-2220 FAX

5 Attorneys for Movant

6

7

8                  UNITED STATES BANKRUPTCY COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10 In Re:
                                    )  CASE NO. 10-43311
11 ANDREA K. CHANCELLOR,            )  CHAPTER 7
                                    )  R.S. NO. KK-7234
12          Debtor.                 )
   _____)
13 ONEWEST BANK, FSB, A FEDERALLY   )
   CHARTERED SAVINGS BANK,          )  ORDER ON MOTION FOR
14                                  )  RELIEF FROM AUTOMATIC STAY
            Movant,                 )
15                                  )
   vs.                              )
16                                  )  HEARING DATE:
                                    )  DATE:   5/21/10
   ANDREA K. CHANCELLOR, and        )  TIME:  10:00 AM
16                                  )  CTRM:   215
   CHAPTER 7 TRUSTEE, PAUL          )
17 MANSDORF,                        )
                                    )  1300 CLAY STREET
18          Respondents.            )  OAKLAND, CA
   _____)

19

20      The Motion of Secured Creditor OneWest Bank, F.S.B., a Federally

21 Chartered Savings Bank ("Movant") for relief from the automatic stay

22 came on regularly for hearing by the Court on the date, time and place

23 set forth above, before the Honorable Edward D. Jellen.  All

24 appearances are as noted in the court record.

25      Upon reading the papers and pleadings on file herein, and upon

26 hearing oral argument and based on the evidence presented, the Court

27 rules as follows:

28

1    IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the automatic
2   stay provisions of 11 U.S.C. § 362 be and are hereby terminated with
3   respect to the interests of Movant in the real property commonly known
4   as 22812 PARKHILL COURT 8, HAYWARD, CA 94541.

5    IT IS FURTHER ORDERED that Movant may complete its foreclosure of
6   said real property and proceed with post-foreclosure remedies,
7   including any unlawful detainer action, in accordance with applicable
8   law.

9    IT IS FURTHER ORDERED that the fourteen day stay provided by
10  Bankruptcy Rule 4001(a)(3) is waived.

11

12                            END OF ORDER

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT F

1

# "Qualified Written Request"

October 21, 2011

Andrea K. Chancellor
930 Blossom Way 5
Hayward, CA 94541

One West Bank                                    Trustee Sale # 1246210-10
930 Flair Drive 5th Floor             APN #414-0076-112-00
El Monte, CA 91731                               Loan #1009370998
Phone: (800) 781-7399                            Sale Date 12/6/11
Fax: (866) 435-7643

To Whom It May Concern:

I hereby request the following documents regarding my loan. **This letter is a qualified written request (QWR), pursuant to the Real Estate Settlement and Procedures Act (RESPA), 12 U.S.C. § 2605(e).**

**The information I request as part of this (QWR) is as follows:**

1) 1003 Uniformed Residential Loan Application
2) Good Faith Estimate
3) Hud-1 Final Settlement Statement
4) Note
5) Adjustable Rate Riders (if any)
6) Balloon Payment Riders (if any)
7) Deed of Trust
8) Truth in Lending (TILA)
9) 3 Day right of rescission
10) 4506T

I believe my account is in error for the following reasons:

"I suspect violations of the RESPA or of TILA in the processing of certain fees associated with my Loan and Loan Documentation. Can you please give me a specific breakdown of all the fees and an explanation of why they were incurred?"

**Pursuant to 12 U.S.C. § 2605(e), you are hereby notified that placing any negative coding on my credit report before responding to this letter is a violation of RESPA and the FCRA. Your organization will be subject to civil liability if negative coding appears for this account before a response to this QWR is issued to me.**

**Please provide me confirmation that you have received this QWR within 20 days, as required under 12 U.S.C. § 2605(e). Thereafter, please respond to these questions within 60 days of receipt of this letter, also as required under 12 U.S.C. § 2605(e).**

Regards,

Andrea Chancellor

**EXHIBIT G**

**Gabby Maravilla**

| | |
|---|---|
| **From:** | RingCentral <service@ringcentral.com> |
| **Sent:** | Tuesday, October 18, 2011 12:34 PM |
| **To:** | Gregg Bridwell; Gregg Bridwell; Gregg Bridwell |
| **Subject:** | Fax Message Transmission Result  - All Sent |

Here are the results of the 7-page fax you sent from your phone number (800) 385-6945:

| Name | Phone Number | Date and Time | Result |
|---|---|---|---|
| Cal Western Reconveyance | +1 (619) 590-9299 | Tuesday, October 18, 2011 at 12:29 PM | Sent |
| cal western reconveyance | +1 (866) 416-6715 | Tuesday, October 18, 2011 at 12:33 PM | Sent |

Thank you for using RingCentral.

1

**Gabby Maravilla**

| | |
|---|---|
| **From:** | RingCentral <service@ringcentral.com> |
| **Sent:** | Tuesday, October 18, 2011 12:11 PM |
| **To:** | Gregg Bridwell; Gregg Bridwell; Gregg Bridwell |
| **Subject:** | Fax Message Transmission Result  - All Sent |

Here are the results of the 6-page fax you sent from your phone number (800) 385-6945:

| Name | Phone Number | Date and Time | Result |
|---|---|---|---|
| indymac | +1 (269) 353-2474 | Tuesday, October 18, 2011 at 12:05 PM | Sent |
| one west bank | +1 (866) 435-7643 | Tuesday, October 18, 2011 at 12:10 PM | Sent |

Thank you for using RingCentral.

English        Customer Service        USPS Mobile                                    Register / Sign In

# USPS.COM

Search USPS.com or Track Packages

Quick Tools          Ship a Package      Send Mail        Manage Your Mail        Shop        Business Solutions

## Track & Confirm

GET EMAIL UPDATES      PRINT DETAILS

| YOUR LABEL NUMBER | SERVICE | STATUS OF YOUR ITEM | DATE & TIME | LOCATION | FEATURES |
|---|---|---|---|---|---|
| 23082940000029500518 | Priority Mail® | Delivered | October 21, 2011, 10:44 am | EL CAJON, CA 92022 | Expected Delivery By: October 22, 2011 Signature Confirmation™ Proof of Delivery |
| | | Notice Left | October 21, 2011, 8:58 am | EL CAJON, CA 92020 | |
| | | Arrival at Post Office | October 21, 2011, 5:44 am | EL CAJON, CA 92020 | |
| | | Processed through USPS Sort Facility | October 21, 2011, 2:37 am | SAN DIEGO, CA 92186 | |
| | | Acceptance | October 20, 2011, 4:39 pm | COVINA, CA 91723 | |

### Check on Another Item

What's your label (or receipt) number?

LEGAL
Privacy Policy ›

ON USPS.COM
Government Services ›

ON ABOUT.USPS.COM
About USPS Home ›
Newsroom ›
Mail Service Updates ›
Forms & Publications ›
Careers ›

OTHER USPS SITES
Business Customer Gateway ›
Postal Inspectors ›
Inspector General ›
Postal Explorer ›

**.S. Postal Service™ Signature Confirmation™ Receipt**

Postage and Signature Confirmation fees must be paid before mailing.

*Cal western-Chancellor*

(Please Print Clearly)

**POSTAL CUSTOMER:**
Keep this receipt. For inquiries:
Access internet web site at
www.usps.com ®
or call 1-800-222-1811

Postmark
Here

CHECK ONE (POSTAL USE ONLY)
☑ Priority Mail™ Service
☐ First-Class Mail™ parcel
☐ Package Services parcel

23082940 0000 2950 0518

Form 153, January 2005                    (See Reverse)

1 of 1                                                                11/2/2011 5:49 PM